**William (Billy) SWOPE, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Dec. 11, 1964.

———◆———

Henry Cox, Lancaster, for appellant.

Robert Matthews, Atty. Gen., Henry Mangeot, Deputy Atty. Gen., J. T. Frankenberger, Asst. Atty. Gen., W. A. Wickliffe, Commonwealth's Atty., Harrodsburg, for appellee.

MOREMEN, Judge.

On the evening of March 11, 1964, appellant, William Swope, a member of the 1964 General Assembly of Kentucky, left Frankfort to attend a high school basketball game at Danville while the General Assembly was in regular session. When Senator Swope and his party parked their automobile a dispute arose which resulted in appellant's being arrested on the charge of breach of the peace. At a trial, on appeal, in the circuit court, the evidence produced by the Commonwealth conflicted with that introduced in behalf of the appellant. The case was submitted to a jury which found Senator Swope guilty and fixed his punishment at a fine of $100.00.

It is contended that the circuit court was without jurisdiction to try the offense of breach of peace against a member of the General Assembly of Kentucky under the provisions of § 43 of our Constitution which, according to the Legislative Research Commission's 1962 edition of the Kentucky Revised Statutes, reads in part as follows:

"The members of the General Assembly shall, in all cases except treason, felony, breach of surety of the peace, be privileged from arrest during their attendance on the sessions of their respective Houses, and in going to and returning from the same * * *"

Baldwin's Kentucky Revised Statutes, 3rd Edition, differs from the foregoing in that it states "breach or surety of peace," as did the first three Constitutions of Kentucky. However, in view of the discussion that will follow, this difference is of no importance.

We have found no opinion of this Court which defines the extent of the exception from parliamentary privilege embodied in the phrase "treason, felony and breach (or surety) of the peace." Because of the lack of such a definition each person seems to have accepted his own idea as to the true meaning of the phrase. This has caused considerable confusion and uncertainty, with the result that neither members of the general assembly nor law enforcement officers are sure of their rights or their duties.

During the time before the Revolutionary War and at the time of the drafting of our

**58**

various constitutional documents the meaning was plain. The English common law had defined the limits of parliamentary privilege and had determined the extent of exclusion contained in the phrase "treason, felony and breach of the peace."

In England these words were used for the purpose of excluding *all* crimes from the operation of parliamentary privilege. The only immunity that remained protected against prosecutions of a civil nature.

The phrase appears with monotonous regularity in the Articles of Confederation (1778); the Constitution of the United States (1789); the first Constitution of Kentucky (1792); the second, (1799); the third, (1850); and our present (1891) Constitution.

When the legal profession knows the exact meaning of a word or a phrase, it is inclined to use those instruments of thought repeatedly; even though they become trite they retain meaning which is of more importance than the euphony of language.

In an elaborate opinion in Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278, the origin and meaning of the words in England and in this country are traced and defined with historical accuracy. We will not attempt to summarize this carefully written opinion, but this quotation is apropos:

"The presence of the exact words of the exception as now found in the Constitution, in the Articles of Confederation, and the employment of the same words 'treason, felony, and breach of the peace,' without discussion, in all the proceedings of the convention relating to the subject of the privileges of members of Congress, demonstrate that those words were then well known as applied to parliamentary privilege, and had a general and well-understood meaning, which it was intended that they should continue to have. This follows, because it is impossible to suppose that exactly like words, without

any change whatever, would have been applied by all those engaged in dealing with the subject of legislative privilege, unless all had a knowledge of those words as applied to the question in hand, and contemplated that they should continue to receive the meaning which it was understood they then had. A brief consideration of the subject of parliamentary privilege in England will, we think, show the source whence the expression 'treason, felony, and breach of the peace' was drawn, and leave no doubt that the words were used in England for the very purpose of excluding all crimes from the operation of the parliamentary privilege, and therefore to leave that privilege to apply only to prosecutions of a civil nature."

In Long v. Ansell, 63 App.D.C. 68, 69 F.2d 386, 94 A.L.R. 1466, it was pointed out that arrest for debt was a common thing in former times and the civil processes in such cases could be extended by anyone who claimed to be a creditor to practically all property of an alleged debtor and opened avenues for "monstrous abuses." The opinion stated:

"The constitutional exemption has never been interpreted as a retreat for Congressmen and Senators from arrest for crime. At the time of the adoption of the Constitution there were laws in the states authorizing imprisonment for debt in aid of civil process. Undoubtedly it was to meet this condition that the exemptions in federal and state Constitutions were aimed. The reason for incorporating this provision in the Constitution has largely disappeared. We no longer have imprisonment for debt, except in a few jurisdictions where an absconding debtor may be arrested and imprisoned. The decisions of the courts, therefore, in limiting the exemption merely to arrests in aid of civil process, and in conformity with the practice of legislation on this subject, have greatly limited the scope of

the exemption. That which at the time of the adoption of the Constitution was of substantial benefit to a Member of Congress has been reduced almost to a nullity."

Section 18 of the Kentucky Constitution provides: "The person of a debtor, where there is not strong presumption of fraud, shall not be continued in prison after delivering up his estate for the benefit of his creditors in such manner as shall be prescribed by law." KRS 426.390 provides that a capias ad satisfaciendum may issue upon certain specialized judgments, and we presume there are other circumstances where a person may be arrested in connection with fraudulent debt so, to this extent, members of the General Assembly are still protected. Therefore, in this state, the parliamentary immunity has not been "reduced almost to a nullity." However, we believe it to be plain that § 43 of the Constitution was never intended as a sanctuary for members who had committed a public offense.

Judgment affirmed.